UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF TENNESSEE *ex rel.* [SEALED], | )<br>)<br>) | CIVIL ACTION NO. _____ |
| Plaintiff/Relator, | ) | RELATOR'S ***SEALED*** COMPLAINT |
| vs. | ) | PURSUANT TO THE FEDERAL FALSE |
| | ) | CLAIMS ACT, 31 U.S.C. §3729, *ET SEQ.* |
| [SEALED] | ) | |
| | ) | **FILED UNDER SEAL** |
| Defendant. | ) | **DO NOT PLACE ON PACER** |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and the STATE OF TENNESSEE *ex rel.* JENNIFER PRESSOTTO, | ) ) ) ) | CIVIL ACTION NO. _____ |
| | ) | RELATOR'S ***SEALED*** COMPLAINT |
| | ) | PURSUANT TO THE FEDERAL FALSE |
| Plaintiff/Relator, | ) | CLAIMS ACT, 31 U.S.C. §3729, *ET SEQ.* |
| vs. | ) | |
| | ) | **FILED UNDER SEAL** |
| ANESTHESIA SERVICES ASSOCIATES, | ) | **DO NOT PLACE ON PACER** |
| PLLC d/b/a COMPREHENSIVE PAIN | ) | **JURY TRIAL DEMANDED** |
| SPECIALISTS | ) | |
| | ) | |
| Defendant. | ) | |

## RELATOR'S COMPLAINT PURSUANT TO THE
## FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.*

On behalf of the United States of America and the State of Tennessee, Plaintiff and Relator Jennifer Pressotto ("Relator") brings this *qui tam* complaint against Anesthesia Services Associates, PLLC d/b/a Comprehensive Pain Specialists ("CPS" or Defendant) for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§3729 *et seq.*, and the Tennessee Medicaid False Claims Act, TENN. CODE ANN. §71-5-181 *et seq.* to recover all damages, civil penalties and other recoveries provided for under those statutes. Relator also brings this action on her own behalf against Defendant for Defendant's termination of her employment in retaliation for her efforts to stop Defendant's fraud against the United States and the State of Tennessee, in violation of 31 U.S.C. § 3730(h) and TENN. CODE ANN. §71-5-183(g).

## I.    THE PARTIES

1.    Defendant Anesthesia Services Associates, PLLC is a Tennessee professional limited liability company headquartered at 1650 Murfreesboro Road, Suite 145, Franklin,

1

Tennessee. Defendant does business under the trade name Comprehensive Pain Specialists ("CPS"). The company was founded in 2005 by Drs. Peter Kroll, Timothy Arney, Steven Dickerson, and Gilberto Carrero, and now has more than 50 locations throughout the United States—concentrated primarily in the Southeast. The company touts itself as specializing in the treatment and management of chronic pain.

2.      Relator, Jennifer Pressotto ("Ms. Pressotto" or "Relator"), is a resident of Spring Hill, Williamson County, Tennessee. From January 2014 until her termination in July of 2014, Ms. Pressotto served as the Director of Compliance for CPS.

3.      Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b). Relator's complaint is not based on any other prior disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

4.      Relator has disclosed all of the material evidence and information underlying her allegations to the United States, pursuant to 31 U.S.C. § 3730(b)(2).

5.      The United States is a plaintiff to this action. The United States brings this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded health care programs, including Medicare.

6.      The State of Tennessee is also a party to this action. Tennessee, on behalf of the Bureau of TennCare and the director of Health Care Finance and Administration of the State of Tennessee, provides services to TennCare beneficiaries under contracts (titled Contractor Risk Agreements) with various Managed Care Organizations ("MCOs"). These MCOs are essentially

private insurance companies who have contracted with the State of Tennessee to coordinate and provide TennCare services. Defendant has fraudulently billed the State of Tennessee just as it has fraudulently billed the United States.

## II.     SUMMARY OF THE ACTION

7.     Relator, on behalf of the United States and the State of Tennessee, brings this case to challenge Defendant's scheme to defraud the Medicare and Medicaid systems.

8.     Specifically, Defendant has defrauded the United States and Tennessee by knowingly billing the Medicare and Medicaid systems for treating patients with non-covered acupuncture devices known as "P-Stims."

9.      Defendant falsely billed these devices under the Healthcare Common Procedure Coding System ("HCPCS") billing code for implantable electroneural stimulators—L8680—a completely different device from the P-Stim devices Defendant was actually using.

10.     When Relator learned that Defendant had been billing for non-covered items under an improper billing code, she demanded that the company conduct an audit and refund Medicare and Medicaid all of the money that had been improperly reimbursed for these P-Stim procedures. That audit took place from approximately April of 2014 through July of 2014.

11.     After the audit concluded, Defendant's CEO, a man named John Davis, refused to refund the money to Medicare and Medicaid, even though the Director of Billing for the company, Ms. Angelia Baker, agreed with Relator that this money all needed to be refunded.

12.     Instead, on or about July 28, 2014, CEO Davis fired Relator without warning, in direct retaliation for her efforts to audit Defendant's P-Stim claims and make sure that Defendant repaid Medicare and Medicaid all of the money that CPS had received for these ineligible items.

3

III.    **JURISIDICTION AND VENUE**

13.     Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act," 31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. § 1331, 1345.  The Court has subject matter jurisdiction over Relator's state law claims pursuant to 28 U.S.C. §1367(a) and 31 U.S.C. §3732(b).

14.     Venue in the Middle District of Tennessee is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, Defendant transacted business in the Middle District of Tennessee and submitted and caused the submission of false claims in the Middle District of Tennessee.

15.     Relator is providing the United States with a full disclosure of substantially all material facts, as required by the FCA, 31 U.S.C. §3730(b)(2).  Relator is also providing the State of Tennessee a full disclosure of substantially all material evidence and information, as required by the TMFCA, TENN. CODE ANN. §71-5-183(b)(2).

IV.    **GOVERNING LAWS AND REGULATIONS**

16.     Title XVIII of the Social Security Act prescribes coverage requirements under Part B of the Medicare program.

17.     As a general matter, Medicare is a limited benefit program and will not pay for any expense that is "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."   42 U.S.C. § 1395y(a)(1)(A).

18.     The Centers for Medicare and Medicaid Services ("CMS") make determinations about whether particular items or services are reasonable and necessary though its National Coverage Determinations.

4

19.     Pursuant to Section 30.3 of the National Coverage Determinations Manual, CMS has made clear that acupuncture is not reimbursable under Medicare.  ("Medicare reimbursement for acupuncture, as an anesthetic or as an analgesic or for other therapeutic purposes may not be made.").

20.     Like Medicare, Medicaid is a limited benefit program, and it is jointly funded by the federal government and the states.  42 U.S.C. §§ 1396 *et seq.*  Enrollees under the TennCare program are eligible to receive, and TennCare provides payment, only for medical items and services that are determined to be "medically necessary" and within the scope of the enrollee's defined benefits.  TENN. CODE. ANN. § 71-5-144(a).

21.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

22.     The FCA also provides that anyone who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(G).

## V.     FACTUAL BACKGROUND – P-STIM TREATMENT

23.     CPS specializes in the management and treatment of pain, and offers various different treatment strategies to patients, including surgical procedures and prescription drugs.

24.     During the period that Relator worked at CPS, one type of treatment that CPS offered was the application of percutaneous stimulation ("P-Stim") devices.

25.     A P-Stim treatment involved attaching the P-Stim device to a patient's ear, at which point three tiny needles in the device would provide constant acupuncture for as many as 96 hours at a time.

26.     CPS's patients typically received between one and three separate rounds of P-Stim treatment, depending on the patient's interest.

## VI.     DEFENDANT'S SCHEMES TO DEFRAUD

### A.     P-Stim Scheme

#### 1.     In General

27.     In late December 2013, Relator was hired on by CPS to serve as the company's Director of Compliance.

28.     On or about March 31, 2014, Relator and other company managers received an email from Ms. Ariane Keller in the CPS human resources department stating that CPS would no longer be providing P-Stim services "due to recent Medicare changes."

29.     This email prompted Relator to do some research on recent Medicare billing changes, as she wanted to make sure she understood what was changing and why P-Stim procedures were no longer reimbursable.

30.     Relator was not able to find much information related specifically to P-Stims, so she expanded her research to HCPCS code L8680—which was the code CPS had been using for billing P-Stim procedures.

31.     From this research, it quickly became clear to Relator that CPS should not have been billing P-Stim procedures under HCPCS code L8680, and in fact should not have been

billing them at all. Specifically, Relator found the minutes of a CMS HCPCS meeting on May 29, 2013 that specifically addressed a request to create a code for P-Stim devices. CMS ultimately declined that request, noting "we believe that there would be no Medicare payment for these items."

32. Likewise, the information Relator found for HCPCS code L8680 showed that this code was only proper as the "device component" of reimbursement for a spinal cord stimulation procedure. As the P-Stim devices had nothing to do with spinal cord stimulation, this HCPCS code was absolutely improper.

33. After discovering that CPS had been improperly billing both Medicare and Medicaid for non-covered items, Relator brought this issue to the attention of the other members of CPS's compliance team—Interim Chief Compliance Officer, Marge Scott; and the Director of Clinical Compliance, Ms. Renata McGhee.

34. Relator also asked the Billing Manager, Ms. Brooke Russell, to perform an audit of the P-Stim claims to determine how much money CPS had received from the United States for P-Stim procedures.

35. This audit took some time to complete, due in part to the fact that Billing Manager Russell and her review team had to review significant amounts of underlying claims data to determine when CPS had been using HCPCS code L8680 to bill for P-Stim treatments, and when CPS had been using the code to bill for actual spinal cord stimulation procedures—which was also a treatment that CPS offered to its patients.

36. In Mid-June, Billing Manager Russell produced an audit report showing approximately 250 P-Stim claims that had been improperly billed to the United States.

37.     Based on this audit report, Relator spoke with interim CCO Scott, and the two of them agreed that this money needed to be refunded.

38.     Interim CCO Scott set a meeting for June 19, 2014 with the full compliance team. Relator was unable to attend that meeting due to a previously scheduled doctor's appointment. Relator believes that Interim CCO Scott deliberately set the meeting for that date so that Relator would be unable to attend.

39.     Director of Clinical Compliance McGhee later talked to Relator about what was discussed at that meeting.  Specifically, Ms. McGhee explained that she and Billing Director Baker decided to conduct a further review of the suspect claims and charts to determine whether CPS could keep any of the money at issue.

40.     By early July, this review was completed, and it was determined that all of the money at issue still needed to be refunded.

41.     However, when Billing Director Baker brought this matter to CEO Davis, he grew angry and categorically refused to allow any of the money to be refunded.

42.     On the morning of July 28, 2014, Relator met with Billing Director Baker and Director of Clinical Compliance McGhee regarding the status of that audit.  During that meeting, Ms. Baker and Ms. McGhee tried to convince Relator that it was proper for CPS to keep the money—even though they acknowledged that HCPCS code L8680 did not correspond to the P-Stim procedure CPS had been performing.

43.     At one point during the meeting, Relator asked Ms. Baker and Ms. McGhee whether anyone at CPS had ever checked with any of the Medicare Administrative Contractors ("MAC") about how to bill P-Stim procedures.  Remarkably, Ms. Baker answered that CPS had checked on this issue at least as early as November of 2013, and that Palmetto GBA, the MAC

8

for North Carolina—one of the states where CPS did business—responded that P-Stims were not compensable under Medicare.

44.     After the meeting ended, Billing Director Baker forwarded Relator the relevant email exchange between CPS and Palmetto. In that email exchange the Palmetto representative specifically stated, in response to a question from Billing Manager Brooke Russell, that "P-Stim is a form of acupuncture which is not considered reasonable and necessary within the meaning of §1862(a)(1) of the [Social Security] Act."

45.      Later that same day, July 28, 2014, CEO Davis fired Relator without notice, in retaliation for her efforts to oversee this audit and ensure that the government's money was refunded.

### 2.     Specific False P-Stim Claims

46.     From her role in the 2014 audit, Relator is aware of many specific false claims for P-Stim treatments that CPS submitted and that the United States and the state of Tennessee paid. The following five examples represent a small subset of the specific false claims of which Relator is personally aware.

47.     On November 13, 2013, CPS performed a P-Stim procedure on patient W.C.[1] at CPS's Centennial B clinic. CPS submitted a claim for payment to Medicare with claim number 358859, seeking payment under HCPCS code L8680. The United States paid CPS $1,016.16 for this treatment under code L8680.

48.     On November 18, 2013, CPS performed a P-Stim procedure on patient C.S. at CPS's Athens, Tennessee clinic. CPS submitted a claim for payment to Medicare with claim

---

[1]     As part of her disclosures to the United States and the State of Tennessee, Relator is producing a list containing full patient names for these P-Stim patients. In the interest of patient confidentiality, Relator is using only patient initials in this complaint.

9

number 370945, seeking payment under HCPCS code L8680. The United States paid CPS $1,016.16 for this treatment under code L8680.

49. On December 19, 2013, CPS performed a P-Stim procedure on patient C.B. at CPS's Columbia, Tennessee clinic. CPS submitted a claim for payment to Medicare with claim number 390225 seeking payment under HCPCS code L8680. The United States paid CPS $1,016.16 for this treatment under code L8680.

50. On December 23, 2013, CPS performed a P-Stim procedure on patient D.S. at CPS's Athens, Tennessee clinic. CPS submitted a claim for payment to both Medicare and Medicaid of Tennessee, with claim number 395648. Medicare paid CPS $1,016.16 for this treatment under code L8680, and Tennessee Medicaid paid $67.91 for this treatment under code L8680.

51. On January 14, 2014, CPS performed a P-Stim procedure on patient M.B. at CPS's Hermitage, Tennessee clinic. CPS submitted a claim for payment to Medicare with claim number 414124, seeking payment under HCPCS code L8680. The United States paid CPS $1,026.31 for this treatment under code L8680.

**B.     Improper Billing under HCPCS Code L8680 After January 1, 2014**

52. During her review of CPS's claims data billed under HCPCS Code L8680, Relator uncovered another, related scheme to defraud the United States and the State of Tennessee.

53. As noted above, CPS stopped performing P-Stim procedures in March of 2014, based on an ostensible "change" in Medicare reimbursement policies. However, CPS continued to use the L8680 code when billing for the "device component" of a spinal cord stimulation

Case 3:16-cv-01856   Document 1   Filed 07/18/16   Page 11 of 22 PageID #: 11

implant that CPS was performing. As Relator discovered, there were two basic problems with this billing practice.

54. First, in 2014, CMS revised its DMEPOS fee schedule to show that L8680 was no longer a covered Medicare code as April 1, 2014. Instead, the cost of the actual neuro-stimulator electrode array was bundled into the reimbursement rate under CPT code 63650—*i.e.* the procedure code for applying those arrays to a patient. Accordingly, every claim that CPS separately billed to the United States and/or the State of Tennessee after April 1, 2014 HCPCS code L8680 was a false claim.

55. Second, Relator noticed that CPS was using the L8680 code to bill for neuro-stimulator arrays regardless of whether CPS was performing the actual surgery to install those devices or whether CPS was just performing the initial device trial on the patient.

56. Relator researched this issue, and found no evidence to suggest that it was proper to bill under code L8680 during these trial procedures, when the electrode arrays were not actually being implanted into the patients.

57. Relator raised these issues with Interim CCO Marge Scott on or about July 23, 2014. CCO Scott agreed that CPS would have to refund this money—particularly for the post-April 1 billing under Code L8680—but suggested that they wait on raising the issue with CEO Davis until after the P-Stim refund issue had been resolved. Relator reluctantly agreed.

58. Approximately five days later, on July 28, 2014, Relator was fired in retaliation for organizing and overseeing the P-Stim audit, and the additional improper billing under code L8680 was never formally addressed by CPS and, to Relator's knowledge, no refunds were ever made for those claims.

### C. Overbilling for Patient Drug Testing

59. During her time at CPS, Relator also became aware that CPS was overbilling for significant amounts of unnecessary drug testing at CPS's lab.

60. As a practice group specializing in the treatment of pain, many of CPS's patients received prescriptions for heavy-strength pain medication, such as Lortab and oxycodone.

61. In order to ensure that patients were taking these medications properly—rather than using them recreationally or selling them, in violation of federal law—CPS performed regular blood tests on all patients receiving scheduled pain medication.

62. While such blood testing was itself perfectly proper, Relator became concerned that CPS was over-testing these patients as a way to refer more and more business to CPS's own clinical laboratory, located in Franklin, Tennessee.

63. Relator became particularly concerned about this issue when she was presented with a number of letters, sent from Medicare MAC Cahaba to various CPS providers, stating that these specific providers were significant outliers with respect to how often they ordered secondary drug testing for their patients.

64. As a result of these letters, Relator performed a review of 24 different patient charts to determine what documentation CPS has of the need for this secondary drug testing. While Relator does not have a clinical background, she knew from her experience in the health care field that these patient charts should contain some documentation of the need for a secondary drug test. However, for the vast majority of these patient files, Relator found that there was no evidence at all that any secondary testing was required.

65.     When Relator raised this issue with Ms. Renata McGhee, the Director of Clinical Compliance, Ms. McGhee noted that it was CPS policy that all patients receive secondary drug testing, regardless of what the preliminary tests showed.

66.     Relator also discovered that in October of 2013, CPS had stopped allowing its providers to perform any initial drug testing on site.  These on-site tests, which were billed under HCPCS code G0434, were relatively simple tests and carried a reimbursement rate of approximately $19.84.  After October of 2013, CPS required providers to submit patient samples to CPS's off-site lab for more complex testing under code G0431, which carried a reimbursement rate of just under $100.

67.     CPS performed these more expensive off-site tests regardless of whether the particular patient presented any obvious signs of drug seeking behavior.  As noted above, CPS would then proceed to perform a second "quantitative" test under CPT code series 80000, regardless of the medical necessity.

68.     For example, a patient who was being prescribed opioids with have an initial test performed and billed under HCPCS code G0431, and would then have a second test performed under CPT Code 83925 to test the quantity of the drug in the patient's system, even if the first test came back normal and even if the patient had no history or documentation of aberrant behaviors.

69.     Accordingly, many, if not most of these tests were not medically necessary, and should not have been billed to the United States or the State of Tennessee

VII.     DEFENDANT RETALIATES AGAINST RELATOR

70.     While the Billing Director, Billing Manager, and Director of Clinical Compliance at CPS were willing to at least engage with Relator regarding her efforts to ensure that CPS's P-

13

Stim claims were audited and that the government received a refund for all improperly billed claims, CEO Davis was hostile to these efforts and ultimately fired Relator in retaliation for her actions.

71.    By early July, the Billing Director and Director of Clinical Compliance seemed to have come around to Relator's position that CPS would have to refund all of the money that it had billed to the United States for P-Stim procedures under HCPCS Code L8680.  However, no further steps were taken to refund this money.

72.    During this period, Relator regularly emailed and called Interim CCO Marge Scott asking about the status of this audit and refund.  However, Ms. Scott did not respond to any of Relator's emails or return any of Relator's calls.

73.    Moreover, as noted above, when Billing Director Russell brought this issue to CEO Davis' attention and told him about the review that Relator had organized, CEO Davis became incredibly angry and made clear that he would not agree to refund any P-Stim money.

74.    Just a few weeks later, on July 28, 2014, Relator was called into a meeting with CEO Davis and CCO Scott and was fired, without any advance notice or explanation.

75.    At her termination meeting with CEO Davis and CCO Scott, Relator stated her belief that she was being fired in retaliation for her efforts to audit CPS's P-Stim claims.

76.    CEO Davis brushed this allegation off, saying he was unaware of what P-Stims were, despite the fact that he had a heated argument about P-Stims with Billing Director Russell earlier that month.

**VIII.  CAUSES OF ACTION**

## COUNT I
### Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(A)-(B)

77.     Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

78.     This is a claim by Relator, on behalf of the United States of America, for treble damages and penalties under the FCA, 31 U.S.C. §§3729-3733, against Defendant for knowingly causing to be presented false or fraudulent claims for payment or approval, and/or for making, using, or causing to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States government.

79.     The false records and statements by CPS include claims forms representing that CPS was seeking payment for reimbursement related to spinal cord stimulation procedures under HCPCS Code L8680, when CPS was actually seeking reimbursement for non-covered P-Stim procedures.

80.     The false records and statements by CPS also include claims submitted under HCPCS Code L8680 after April 1, 2014, which was the date that CMS stopped separately reimbursing providers under that particular HCPCS code.

81.     The false records and statements by CPS also include claims submitted for medically unnecessary drug testing of patients.  CPS submitted claims for more expensive tests than were medically necessarily and also regularly performed secondary drug testing on patients even when there was no medical evidence to justify such secondary testing.

82.     Accordingly, CPS has made, used, and/or caused to be made or used such false statements or records and has caused to be presented claims for payment or approval to the

United States government, knowing such statements or records were false and such claims were false or fraudulent.

83.     By virtue of these false and fraudulent claims that Defendant presented, the United States has suffered actual damages.

84.     Defendant is liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendant.

**COUNT II**
**Knowing Retention and Concealment of Funds Overpaid by the Government**
**In violation of 31 U.S.C. § 3729(a)(1)(G)**

85.     Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs as though full set forth herein.

86.     Defendant received overpayments from the United States – arising from Defendant submitting claims for payment for non-covered items and procedures.

87.     Based on Relator's own actions in reviewing the claims data for these claims and bringing her findings to the attention of senior management at CPS, Defendant had actual notice that it had been paid money from the United States that it was not lawfully entitled to receive.

88.     Defendant CPS was legally obligated to return these funds that the United States had inadvertently paid.

89.     In violation of this legal obligation, Defendant knowingly and actively concealed and avoided its obligation to return these overpaid funds.  This active concealment and avoidance included Defendant's termination of Relator's employment to prevent her from proceeding any further with the audit that she had organized.

90.     By virtue of this knowing concealment, the United States has suffered actual damages.

16

91.     Defendant CPS is liable to the United States for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendant.

<u>**COUNT III**</u>
**Retaliation – 31 U.S.C. § 3730(h)**

92.     Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

93.     CPS has a duty under the False Claims Act to refrain from taking any retaliatory actions against employees for attempts to report or stop fraud, pursuant to 31 U.S.C. § 3730(h).

94.     Relator engaged in protected conduct by organizing an audit of claims that CPS has falsely and fraudulently billed to the United States and attempting to convince her managers at CPS to refund that money to the United States.

95.     Relator's managers, including CEO Davis, were aware that Relator was engaged in protected conduct.

96.     In violation of 31 U.S.C. § 3730(h), Defendant retaliated against Relator's efforts to stop CPS's fraud against the United States by terminating relator's employment on or about July 28, 2014.

97.     CPS's termination of Relator's employment damaged Relator, in an amount to be determined at trial.

98.     Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to her actual damages, to liquidated damages equal to her actual damages, and to her litigation costs, including reasonable attorneys' fees incurred in pursuit of her retaliation claims.

## COUNT IV.
### Violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A) and (B)

99.     Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs by reference.

100.     At all times relevant to this Complaint, Defendant knowingly presented false and fraudulent claims for payment to the State of Tennessee through the TennCare program.

101.     The false records and statements by CPS include claim forms representing that CPS was seeking payment for reimbursement related to spinal cord stimulation procedures under HCPCS Code L8680, when CPS was actually seeking reimbursement for different, for non-covered P-Stim procedures.

102.     The false records and statements by CPS also include claims submitted for medically unnecessary drug testing of patients.  CPS submitted claims for more expensive tests than were medically necessarily and also regularly performed secondary drug testing on patients even when there was no medical evidence to justify such secondary testing.

103.     Accordingly, CPS has made, used, and/or caused to be made or used such false statements or records and has caused to be presented claims for payment or approval to the state of Tennessee, knowing such statements or records were false and such claims were false or fraudulent.

104.     By virtue of these false and fraudulent claims that Defendant presented, the State of Tennessee has suffered actual damages.

105.     Defendant is liable to the State of Tennessee for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,000 to $25,000 for each false claim presented or caused to be presented by Defendant.

18

<u>**COUNT V.**</u>

**Defendant's Retention and Concealment of Overpayments Made Under TennCare in
Violation of the Tennessee Medicaid False Claims Act,
Tenn. Code Ann. §71-5-182(a)(1)(D)**

106.     Relator realleges and incorporates by reference each allegation in each of the
preceding paragraphs by reference.

107.     Defendant knowingly concealed or knowingly and improperly avoided an
obligation to pay or transmit money to the State of Tennessee by failing to repay amounts
received from the State of Tennessee for services that were not eligible for payment by TennCare
under the applicable statutes, rules, and regulations.  Specifically, Defendant knew that it was not
eligible to keep funds that the State of Tennessee had paid for P-Stim procedures that had been
falsely billed under HCPCS Code L8680.  However, rather than paying back the money that it
owed, Defendant concealed its obligation to pay this amount.

108.     By virtue of this knowing concealing and avoidance of its obligations to pay
money to the State of Tennessee, the State of Tennessee has suffered damages.

109.     Defendant is liable to the State of Tennessee for treble damages under the FCA, in
an amount to be determined at trial, plus a civil penalty of $5,000 to $25,000 for each false claim
presented or caused to be presented by Defendant.

<u>**COUNT VI.**</u>
**Retaliation - Tenn. Code Ann. §71-5-183(g)**

110.     Relator realleges and incorporates by reference each allegation in each of the
preceding paragraphs as though fully set forth herein.

111.     CPS has a duty under the Tennessee Medicaid False Claims Act to refrain from
taking any retaliatory actions against employees for attempting to report or stop fraud, pursuant
to Tenn. Code Ann. §71-5-183(g).

19

112.    Relator engaged in protected conduct by organizing an audit of claims that CPS has falsely and fraudulently billed to Tennessee and attempting to convince her managers at CPS to refund that money.

113.    Relator's managers, including CEO Davis, were aware that Relator was engaged in protected conduct.

114.    In violation of TENN. CODE ANN. §71-5-183(g), Defendant retaliated against Relator's efforts to stop CPS's fraud against the United States by terminating relator's employment on or about July 28, 2014.

115.    CPS's termination of Relator's employment damaged Relator, in an amount to be determined at trial.

116.    Pursuant to TENN. CODE ANN. §71-5-183(g), Relator is entitled to her actual damages, to liquidated damages equal to her actual damages, and to her litigation costs, including reasonable attorneys' fees incurred in pursuit of her retaliation claims.

## PRAYER FOR RELIEF

Wherefore, Relator, on behalf of the United States and the State of Tennessee, demands that judgment be entered in her favor and against Defendant for the maximum amount of damages and for such other relief as the Court may deem appropriate on each Count. This includes, with respect to the FCA, three times the amount of damages to the federal government plus civil penalties of no more than $11,000.00 and no less than $5,500.00 for each false claim, and any other recoveries or relief provided for under the FCA, and with respect to the Tennessee Medicaid False Claims Act, three times the amount of actual damages to the State of Tennessee and civil penalties of no more than $25,000 and not less than $5,000 for each false claim, and any other recoveries or relief provided under that statute.

20

Further, Relator requests that she receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and/or the State of Tennessee, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

Relator, on behalf of herself, the United States, and the State of Tennessee, demands a jury on all claims alleged herein.


DATED:      July 18, 2016              Respectfully Submitted

Jerry E. Martin (TBR # 20193)
Seth M. Hyatt (TBR # 31171)
**Barrett Johnston Martin**
**& Garrison, LLC**
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Tel. (615) 244-2202
Fax: (615) 252-3798
shyatt@barrettjohnston.com
jmartin@barrettjohnston.com


*Attorneys for Plaintiff-Relator*

21